**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ROSEMARIE MURO; TERESA CONTRERAS; AARON LANCASTER, | Case No. 1:24-cv-11963 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| MCCAIN FOODS USA, INC.; MCCAIN FOODS LIMITED; LAMB WESTON HOLDINGS, INC.; LAMB WESTON, INC.; LAMB WESTON BSW, LLC; LAMB WESTON/MIDWEST, INC.; LAMB WESTON SALES, INC.; J.R. SIMPLOT CO.; CAVENDISH FARMS LTD; CAVENDISH FARMS, INC.; NATIONAL POTATO PROMOTION BOARD, D/B/A POTATOES USA; CIRCANA, LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ....................................................................................................1

II.   JURISDICTION AND VENUE ...........................................................................4

III.  PARTIES ..............................................................................................................6

    A.    PLAINTIFFS .............................................................................................6

    B.    DEFENDANTS .........................................................................................6

        1.    Lamb Weston .................................................................................6

        2.    McCain .........................................................................................7

        3.    J.R. Simplot ...................................................................................9

        4.    Cavendish Farms .........................................................................10

        5.    Circana ........................................................................................10

        6.    NPPB ...........................................................................................11

IV.  AGENTS AND CO-CONSPIRATORS ............................................................12

V.    FACTUAL ALLEGATIONS .............................................................................13

    A.    The Frozen Potato Products Market. ......................................................13

    B.    Defendants Repeatedly Coordinated Nearly Identical Price Hikes of Frozen Potato Products During the Class Period. ...............................................15

        1.    Prices for Frozen Potato Products Rose Dramatically Because of Defendants' Collusion. ...............................................................15

        2.    Defendants' Exchange of Competitively Sensitive Data and Close-Knit Relationships Enabled Price Coordination. .................................17

        3.    Defendants Imposed Lockstep Price Increases. ..........................18

    C.    The Frozen Potato Product Industry Has Features that Make It Susceptible to Collusion. ...............................................................................................23

        1.    The Frozen Potato Industry Is Highly Concentrated. ................24

        2.    Barriers to Market Entry Are High. ...........................................24

        3.    Frozen Potato Products Have Low Demand Elasticity...............25

        4.    Frozen Potato Products Do Not Have Close Substitutes. ...........26

5.      Frozen Potato Products Are Relatively Homogeneous Commodities. ......26

6.      Defendants' Executives Have Social and Business Relationships. ...........26

VI.     INTERSTATE TRADE AND COMMERCE ................................................29

VII.    ANTITRUST INJURY ................................................................................30

VIII.   TOLLING OF THE STATUTES OF LIMITATIONS ....................................31

IX.     DEFENDANTS ARE NOT IMMUNE ..........................................................32

X.      CLASS ACTION ALLEGATIONS ...............................................................34

XI.     CLAIMS FOR RELIEF ...............................................................................37

COUNT ONE  VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1, 3 .................37

RESTRAINT OF TRADE (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE
        AND EQUITABLE RELIEF)............................................................................37

COUNT TWO..........................................................................................................40

VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1, 3 ........................................40

CONSPIRACY TO EXCHANGE COMPETITIVELY SENSITIVE INFORMATION (ON
        BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE
        RELIEF)...........................................................................................................40

VIOLATIONS OF STATE LAW...............................................................................41

COUNT THREE  VIOLATION OF ALABAMA'S ANTITRUST ACT,  ALA. CODE
        §§ 6-5-60, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
        ALABAMA)......................................................................................................41

COUNT FOUR  VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT,
        ARIZ. REV. STAT. §§ 44-1401, ET SEQ. (WITH RESPECT TO CLASS MEMBERS'
        PURCHASES IN ARIZONA)............................................................................42

COUNT FIVE  VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT,
        ARK. CODE ANN. §§ 4-88-101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS'
        PURCHASES IN ARKANSAS) .........................................................................42

COUNT SIX  VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,  CAL. BUS. & PROF.
        CODE § 16700, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
        CALIFORNIA) ..................................................................................................43

COUNT SEVEN  VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,  CAL.
        BUS. & PROF. CODE § 17200, ET SEQ. (WITH RESPECT TO CLASS MEMBERS'
        PURCHASES IN CALIFORNIA).......................................................................43

COUNT EIGHT  VIOLATION OF COLORADO'S ANTITRUST ACT,  COL. REV. STAT.
        § 6-4-104, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
        COLORADO).....................................................................................................44

COUNT NINE  VIOLATION OF CONNECTICUT'S ANTITRUST ACT,  CONN. GEN. STAT. § 35-24, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN CONNECTICUT) ..........................................................................................................44

COUNT TEN  VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT,  D.C. CODE § 28-4501, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN THE DISTRICT OF COLUMBIA) ...............................................................................45

COUNT ELEVEN  VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT,  FLA. STAT. § 501.201, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN FLORIDA) .............................................................45

COUNT TWELVE  VIOLATION OF THE HAWAII ANTITRUST STATUTE,  HAW. REV. STAT. § 480-1, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN HAWAII) ....................................................................................................................46

COUNT THIRTEEN  VIOLATION OF THE ILLINOIS ANTITRUST ACT,  740 ILL. COMP. STAT. 10/1, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ILLINOIS) ........................................................................................................................46

COUNT FOURTEEN  VIOLATION OF THE IOWA COMPETITION LAW,  IOWA CODE §§ 553.1, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN IOWA) ........................................................................................................................................47

COUNT FIFTEEN  VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,  KAN. STAT. ANN. §§ 50-101, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN KANSAS) ..............................................................................................48

COUNT SIXTEEN  VIOLATION OF MAINE'S MONOPOLIES AND PROFITEERING LAW,  ME. REV. STAT. ANN. TIT. 10, §§ 1101, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MAINE) ...........................................................48

COUNT SEVENTEEN  VIOLATION OF THE MARYLAND ANTITRUST ACT,  MD. CODE COM. LAW § 11-204, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MARYLAND) ..................................................................................49

COUNT EIGHTEEN  VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT,  MASS. GEN. LAWS. CH. 93A § 1, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MASSACHUSETTS) .................................49

COUNT NINETEEN  VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,  MICH. COMP. LAWS ANN. §§ 445.771, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MICHIGAN) ...................................................................50

COUNT TWENTY  VIOLATION OF THE MINNESOTA ANTITRUST LAW,  MINN. STAT. ANN. §§ 325D.49, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MINNESOTA) ..........................................................................................50

COUNT TWENTY-ONE  VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE,  MISS. CODE ANN. §§ 75-21-3, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MISSISSIPPI) ....................................................................................51

COUNT TWENTY-TWO  VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT,  MONT. CODE ANN. §§ 30-14-101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MONTANA) ................................................................51

COUNT TWENTY-THREE  VIOLATION OF THE NEBRASKA JUNKIN ACT,  NEB. CODE ANN. §§ 59-801, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEBRASKA) ..............................................................................52

COUNT TWENTY-FOUR  VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,  NEV. REV. STAT. ANN. §§ 598A.010, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEVADA) ....................................................52

COUNT TWENTY-FIVE  VIOLATION OF THE NEW HAMPSHIRE ANTITRUST STATUTE,  N.H. REV STAT. ANN. §§ 356.1, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW HAMPSHIRE).......................................53

COUNT TWENTY-SIX  VIOLATION OF THE NEW JERSEY ANTITRUST ACT,  N.J. STAT. ANN. § 56:9-3, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW JERSEY).......................................................................53

COUNT TWENTY-SEVEN  VIOLATION OF THE NEW MEXICO ANTITRUST ACT,  N.M. STAT. ANN. §§ 57-1-1, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW MEXICO) ....................................................................54

COUNT TWENTY-EIGHT  VIOLATION OF THE NEW YORK DONNELLY ACT,  N.Y. GEN. BUS. LAW §§ 340, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW YORK) ...........................................................................54

COUNT TWENTY-NINE  VIOLATION OF CHAPTER 75 OF NORTH CAROLINA'S GENERAL STATUTES,  N.C. GEN. STAT. ANN. §§ 75-1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NORTH CAROLINA).............55

COUNT THIRTY  VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT,  N.D. CENT. CODE §§ 51-08.1-01, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NORTH DAKOTA) ..................................55

COUNT THIRTY-ONE  VIOLATION OF THE OREGON ANTITRUST ACT,  OR. REV. STAT. §§ 646.705, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN OREGON) ................................................................................56

COUNT THIRTY-TWO VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,  R.I. GEN. LAWS §§ 6-36-1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN RHODE ISLAND) ...............................................................56

COUNT THIRTY-THREE   VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,  S.D. CODIFIED LAWS §§ 37-1-3.1, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN SOUTH DAKOTA) .........................................57

COUNT THIRTY-FOUR  VIOLATION OF TENNESSEE'S TRADE PRACTICES ACT,  TENN. CODE ANN. §§ 47-25-101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN TENNESSEE) ..................................................57

COUNT THIRTY-FIVE  VIOLATION OF THE UTAH ANTITRUST ACT,  UTAH CODE ANN. §§ 76-10-3101, ET SEQ.  (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN UTAH) ...................................................................................... 58

COUNT THIRTY-SIX  VIOLATION OF THE VERMONT CONSUMER FRAUD ACT,  VT. STAT. ANN. TIT. 9, §§ 2451, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN VERMONT) ...................................................................... 58

COUNT THIRTY-SEVEN  VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT, W.VA. CODE §§ 47-18-1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN WEST VIRGINIA) .............................................................. 59

COUNT THIRTY-EIGHT .............................................................................................. 59

VIOLATION OF THE WISCONSIN ANTITRUST ACT,  WIS. STAT. §§ 133.01, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN WISCONSIN) ............. 59

PRAYER FOR RELIEF ................................................................................................. 60

JURY TRIAL DEMANDED .......................................................................................... 61

Plaintiffs Rosemarie Muro, Teresa Contreras, and Aaron Lancaster, on behalf of themselves and all others similarly situated, bring this Class Action Complaint for damages and injunctive relief against Defendants McCain Foods Limited and McCain Foods USA, Inc., ("McCain"); Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. ("Lamb Weston"); J.R. Simplot Co. ("J.R. Simplot"); Cavendish Farms Ltd. and Cavendish Farms, Inc. ("Cavendish Farms"); National Potato Promotion Board d/b/a Potatoes USA ("NPPB"); and Circana, LLC ("Circana") (collectively "Defendants"). Plaintiffs bring this action for injunctive relief under Section 1 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, and consumer protection laws of the several States against Defendants. Plaintiffs demand a trial by jury.

## I.      INTRODUCTION

1.      Four companies—McCain, Lamb Weston, J.R. Simplot, and Cavendish Farms—dominate the market for frozen french fries, hash browns, tater tots, and other frozen potato products ("Frozen Potato Products"). Those four producers, referred to herein as the "Defendant Processors," account for nearly 98% of the $68 billion annual market for Frozen Potato Products in the United States.

2.      These four Defendant Processors further benefit from their leadership in trade associations like the National Potato Promotion Board, which offered regular opportunities for in-person meetings between Defendants' executives, many of whom served on the NPPB's board. In addition, a third-party data analytics company, Circana, offered detailed data analytics through a program known as "PotatoTrac." That program offered clients—including all four Defendant Processors—in-depth reports on the market for Frozen Potato Products. The insights afforded by these reports offered Defendant Processors' unique insights into one another's pricing strategies.

3.      Starting (at the latest) in early 2021, Defendants abused their dominance in this market, as well as their regular contacts and access to one another's competitively sensitive data, to fix the prices of Frozen Potato Products at artificially inflated levels. Defendants' well-orchestrated conspiracy, and the relatively small number of entities involved, enabled them to coordinate price hikes with unusual effectiveness. In one remarkable five-day stretch in February 2022, for example, ***all four Defendant Processors*** announced nearly identical price hikes of roughly 12 cents per pound on Frozen Potato Products. Defendant Processors' conduct was so blatant that after similar, uniform price increases in April 2022, one Washington, D.C. restaurant owner remarked, "Amazing how all of the major suppliers for French Fries and the like are all raising their prices at the same time and by the same amount. Totally not collusion or anything, right?"

4.      These were far from the only coordinated price hikes of this kind. On at least four other occasions—in January 2021, February 2021, May and June 2021, and October 2021—Defendant Processors issued substantially identical price hikes on Frozen Potato Products at nearly exactly the same time.

5.      Defendants were not subtle about the motivations behind these coordinated price hikes. In 2023, the Director of Sales Solutions for J.R. Simplot explained that Defendants were "push[ing] pricing" rather than "going after new business." The former VP of International at Lamb Weston explained that Defendants "absolutely" have "no incentive to fight that hard for each other's share." Rather than compete for market share, Defendants were content to "behav[e] themselves."

6.      As a result, according to the Director of Sales Solutions at J.R. Simplot, when some customers threatened to switch to a competitor after the company increased its prices, J.R. Simplot responded with confident indifference: "[W]e weren't worried about it." That confidence was well-

founded. When a Senior Director for McCain Foods indicated interest in competing with Lamb Weston on the price of battered fries in order to pursue increased market share, "the higher ups in the room" advised against the idea because they didn't want "to screw it up for everyone."

7.   All of this occurred even as the input costs for Frozen Food Products *declined* dramatically. This combination of coordinated price hikes and declining costs led to unprecedented profit margins, as demonstrated by the following graph:



Frozen Potato Prices (LHS) Compared to Potato Processing Cost Index (RHS), Jan 2010 - Jul 2024

8.   Industry observers assumed this level of profitability would be short-lived. Two stock analysts, for example, predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not "be durable longer term." These assumptions, however, were based on a competitive market, and those assumptions proved unfounded in an industry where ostensible competitors focus on "behaving themselves" rather than "going after business." As the former VP of International at Lamb Weston acknowledged, "I think we've done a pretty good job at taking

margins with these price increases." The results were startling. As that same executive acknowledged, Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry."

9.      Plaintiffs bring this proposed class action on behalf of indirect purchasers of Frozen Potato Products—individual consumers who purchased everyday products like frozen french fries, tater tots, and hash browns for their own personal consumption. Plaintiffs seek equitable and monetary relief, and to restore competition in the marketplace.

## II.      JURISDICTION AND VENUE

10.      Plaintiffs bring this antitrust class action lawsuit under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and various state antitrust and consumer protection laws. Plaintiffs' federal claims seek equitable relief, costs, and reasonable attorneys' fees for the injuries sustained by Plaintiffs and the Classes, while Plaintiffs' state-law claims seek injunctive relief, damages, costs, and reasonable attorneys' fees for the same.

11.      The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has jurisdiction over Plaintiffs' claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court has supplemental jurisdiction over Plaintiffs' state-law claims because the claims arise from the same facts as Plaintiffs' federal claims and form part of the same case or controversy as those claims, 28 U.S.C. § 1367.

12.      The Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward, and had substantial contacts with, this jurisdiction. Defendants purposefully placed price-fixed Frozen Potato Products into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of this state's laws and protections. Plaintiffs' claims for relief arises from and relates to illegal

acts committed by Defendants within this jurisdiction because, within this jurisdiction, Plaintiffs paid unlawfully inflated prices for Frozen Potato Products and thereby suffered antitrust injury. The Court also has jurisdiction based on Defendants' minimum contacts with the United States as a whole.

13. The Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permit antitrust lawsuits against a corporation in any district where the corporation may be found or transacts business and allow process in such cases to be served in any district where the corporation may be found.

14. Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period (defined below), Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District. Additionally, Defendant McCain Foods USA, Inc., has its corporate headquarters and principal place of business in Oak Brook, Illinois, within the Northern District of Illinois.

15. Defendants' conduct alleged occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

16. During the Class Period, Defendants processed and sold Frozen Potato Products in a continuous and uninterrupted flow of interstate commerce, which included the processing and sale of Frozen Potato Products, media advertisement of Frozen Potato Products, and employment of sales personnel—all in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

17. No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.    PARTIES

**A.    PLAINTIFFS**

18.    Plaintiff Teresa Contreras is a California resident residing in the County of Kern where she purchased Frozen Potato Products, including frozen hash browns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

19.    Plaintiff Rosemarie Muro is a Florida resident residing in the County of Hernando where she purchased Frozen Potato Products, including frozen tater tots and frozen hash browns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

20.    Plaintiff Aaron Lancaster is a District of Columbia resident residing in the District of Columbia, where he purchased Frozen Potato Products for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

**B.    DEFENDANTS**

**1.    Lamb Weston**

21.    Defendant Lamb Weston Holdings, Inc. is a Delaware corporation headquartered in Eagle, Idaho. It is a leading marketer, producer, and distributor of Frozen Potato Products. Lamb Weston Holdings, Inc. stock is traded on the New York Stock Exchange as "LW". It began as part of Conagra Brands, Inc., which spun off Lamb Weston Holdings, Inc. in 2016 to Conagra shareholders.

22.    Lamb Weston Holdings, Inc. owns and operates several United States subsidiaries, including Lamb Weston, Inc. (a Delaware corporation), Lamb Weston BSW, LLC (a Delaware LLC), Lamb Weston/Midwest, Inc. (a Washington corporation), and Lamb Weston Sales, Inc. (a Delaware corporation). The consolidated financial statements of Lamb Weston Holdings, Inc.,

indicate that Lamb Weston Holdings, Inc. wholly owns and controls these subsidiaries and operates them as a unitary enterprise. On information and belief, Lamb Weston Holdings, Inc., conducts its Frozen Potato Products business in the United States through these subsidiaries, including by manufacturing, pricing, and selling Frozen Potato Products in the United States. Lamb Weston's publicity for product purchasers and investments refers to "Lamb Weston" or "Lamb Weston Holdings, Inc." Below, this complaint refers to Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. collectively as "Lamb Weston."

23. In North America, Lamb Weston sells Frozen Potato Products to quick-service and full-service restaurants, food service distributors, non-commercial channels, and retailers. Its products include Frozen Potato Products, commercial ingredients, and appetizers sold under the Lamb Weston brand as well as frozen potatoes sold under its owned or licensed brands, and brand names of North American restaurants, customer labels, and retailers' own brands (i.e., private label products). It had $4.2 billion in sales in North America in fiscal year 2023.

24. Lamb Weston operates 27 production facilities and sources its products under "co-packing" agreements, a common practice in the industry wherein manufacturing is outsourced to other companies.

### 2. McCain

25. Defendant McCain Foods Limited is a corporation organized under the laws of New Brunswick, Canada, with its corporate headquarters in Toronto, Canada. The corporation operates on 47 sites on six continents. It owns United States patents and over 50 United States trademarks.[1]

---

[1] *McCain Foods Limited Trademarks*, Justia Trademarks, https://trademarks.justia.com/owners/mccain-foods-limited-116080/index.html; McCain Foods Limited Trademarks, Justia Trademarks, https://trademarks.justia.com/owners/mccain-foods-limited-116080/page2.

26.     McCain Foods Limited, a dominant Frozen Potato Products producer, is a privately owned company with global revenues of more than $14 billion Canadian dollars. One of the world's largest manufacturers of french fry and potato products, McCain Foods boasts that one in four "fries in the world is a McCain Foods fry." In addition to Frozen Potato Products, McCain Foods Limited's product portfolio also includes appetizers, pizzas, frozen fruits, vegetables, and desserts.

27.     McCain Foods Limited operates in the United States through its subsidiary, McCain Foods USA, Inc.

28.     McCain Foods USA, Inc., a subsidiary of McCain Foods Limited, is incorporated in Maine and has its corporate headquarters and principal place of business at One Tower Lane, 11th Floor, Oakbrook Terrace, Illinois, within the Northern District of Illinois. According to the Illinois Secretary of State, CT Corporation System's office in Chicago, Illinois is McCain Foods USA, Inc.'s registered agent in Illinois. McCain Foods USA, Inc. provides frozen potato and other snack foods "primarily for foodservice customers, retail grocers and private label brands in restaurants and supermarket freezers nationwide" in the United States. It has approximately 4,000 employees in its factories in Maine, Idaho, Nebraska, Washington, and Wisconsin.

29.     McCain Foods recently advertised for a Director of Sales for U.S. Retail with a "Position Location" of Oakbrook Terrace, Illinois. The position, as listed, involves leading businesses, expanding commercial relationships, managing a team, developing business, planning, and managing key customer relationships.[2]

---

[2] *Director Sales US Retail – McCain Foods,* Builtin Chicago (Oct. 2, 2024), https://www.builtinchicago.org/job/director-sales-us-retail/263884.

30.     Further, McCain Foods also recently sought to hire an employee for hybrid work at its Supply Chain Leadership Development Program at its Oakbrook Terrace, Illinois office.[3] The advertisement for the position stated that the employee would support McCain's customers (i.e., selling Frozen Potato Products) and enable McCain's supply chain (i.e., buying Frozen Potato Products or inputs for McCain). McCain Foods has posted 23 jobs located in Oakbrook Terrace, Illinois, or in Chicago, Illinois.[4] It is a reasonable inference that McCain Foods Limited and McCain Foods USA sell and have sold Frozen Potato Products in Illinois and in this Judicial District in furtherance of Defendants' conspiracy.

31.     McCain Foods Limited and McCain Foods USA, Inc., are collectively referred to as "McCain."

**3.      J.R. Simplot**

32.     J.R. Simplot Company is a Nevada Corporation with its headquarters in Boise, Idaho. It is a privately owned company with over 13,000 employees worldwide and claims to be one of the world's largest french fry producers. J.R. Simplot sells Frozen Potato Products in this District, throughout the State of Illinois, and elsewhere in the United States. J.R. Simplot has admitted in other litigation that it sells products in this District, and has conceded that this District may exercise personal jurisdiction and venue over J.R. Simplot. Its other businesses include phosphate mining, food brands, farming, ranching, and fertilizer manufacturing. Its 2023 revenue was $9.8 billion.

---

[3] *Supply Chain Leadership Development Program – McCain Foods*, Builtin Chicago, (Oct. 7, 2024), https://www.builtinchicago.org/job/supply-chain-leadership-development-program/262066.

[4] *McCain Foods in Chicago, Illinois, United States* LinkedIn, https://www.linkedin.com/jobs/mccain-foods-jobs-chicago-il/?currentJobId=4024758735.

### 4. Cavendish Farms

33.     Cavendish Farms Ltd. is a part of the J.D. Irving Group of Companies, which has its headquarters in Dieppe, New Brunswick, Canada. Cavendish Farms is North America's fourth largest processor of Frozen Potato Products. Cavendish Farms Ltd. operates four potato processing plants, including one in Jamestown, North Dakota, and sells Frozen Potato Products in the United States.

34.     Cavendish Farms, Inc., is a Delaware corporation with its principal place of business in North Dakota. It is the United States-based subsidiary of Cavendish Farms Ltd.

35.     Cavendish Farms Ltd. and Cavendish Farms, Inc., are collectively referred to herein as "Cavendish Farms."

### 5. Circana

36.     Defendant Circana, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois.

37.     Circana was created after the August 2022 merger of two data analytics firms, Information Resources, Inc. and The NPD Group.[5] It "is the leading advisor on the complexity of consumer behavior. Through unparalleled technology, advanced analytics, cross-industry data and a deep expertise, Circana provides clarity that helps clients take action and unlock business growth."[6]

38.     Circana's predecessor, The NPD Group, designs, maintains, and/or is otherwise affiliated with the industry service PotatoTrac. PotatoTrac enables competitors in the Frozen Potato Product Market, including the Defendant Processors, to directly exchange data to control

---

[5] https://www.circana.com/intelligence/press-releases/2023/news-press-releases-iri-and-npd-rebrand-as-circana/.

[6] *Id.*

supply, costs, and downstream pricing. Specifically, PotatoTrac allows Defendant Processors to collect and standardize data, which in turn allows them to monitor or discipline co-conspirators. PotatoTrac's detailed reports provide competitors with a view of the entire market, removing questions of competition on price. Beyond the pricing reports themselves, PotatoTrac allows processors to understand the market using colorful graphs and other helpful graphics to highlight price directions.

**6.    NPPB**

39.     Defendant National Potato Promotion Board d/b/a Potatoes USA is a business entity with its principal place of business located at 3675 Wynkoop Street in Denver, Colorado.

40.     NPPB is a trade association. The four Defendant Processors—again, Lamb Weston, McCain Foods, JRS and Cavendish Farms—are members of NPPB. Other potato growers and importers are also NPPB members.

41.     NPPB's mission is "to strengthen the demand for potatoes."[7] NPPB seeks to "coordinate regional, national and even international research efforts to collect potato-related data[.]"[8] This is done to "analyze potato volumetric data" to "help our grow partners understand [consumer] demand."[9] NPPB's ultimate goal is to "grow our entire industry beyond our wildest imaginations."[10] NPPB also offers export assistance called the "Market Access" program. This program includes research resulting in "higher yields and reduced inputs" for FPP producers, and joint marketing programs.[11]

---

[7] https://potatoesusa.com/about/what-we-do/.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11]  https://potatoesusa.com/wp-content/uploads/2019/12/What-is-Potatoes-USA-Doing.pdf.

42. NPPB also uses Circana's data to provide information that influences the industry to adjust pricing and take other actions. NPPB does this by combining Circana pricing data with press releases to show sales trends. For example, on June 6, 2023, an NPPB press release reported that "[p]otato retail sales increased 16% in sales but decreased in volume by -4.4% from January – March 2023 [...] [a]ll categories of potatoes increased in dollar sales, with the most significant occurring for potatoes by 41.9%."[12] Regular press releases like this one and access to Circana's data, help Defendant Processors know which direction and how much to move pricing.

43. According to econometric analysis by Timothy J. Richards of Arizona State University, NPBB's activities lead to higher priced potatoes.[13] As Dr. Richards reports:

> Over the 2016-2020 study period, potato shipments were initially stable, and then declined substantially. Grower prices, however, remained high . . . While 2020 likely represented an outlier in terms of market demand for potatoes, in general, marketing activities funded by [NPPB] may have prevented a steeper decline.

44. The study concludes, "[w]e find that all [NPPB] activities were effective in raising demand when controlling for the effect of prices, seasonality and changes in production conditions and other factors relevant to the demand for fresh potatoes and processed potato products."[14] In other words, NPPB's activities help stabilize the effect of mitigating factors and confounding variables, like a drop in demand, for Defendant Processors.

## IV.    AGENTS AND CO-CONSPIRATORS

45. The unlawful and anticompetitive acts that this Complaint alleges Defendants undertook alleged against the Defendants in this Complaint were authorized, ordered, or performed by Defendants' agents, officers, employees, or representatives, while managing, directing, or

---

[12] *Id.*

[13] https://potatoesusa.com/wp-content/uploads/2022/07/2022-Potatoes-USA-Evaluation-Study.pdf.

[14] *Id.*

controlling Defendants' affairs or businesses. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

46.     Each Defendant's agents operated under the authority and apparent authority of its respective principals.

47.     Each Defendant, through its respective affiliates, agents, and subsidiaries, operated as a single unified entity.

48.     Other persons or entities not named as Defendants here may have participated as co-conspirators in the violations alleged in this Complaint.  These other persons and entities may also have performed acts and made statements in furtherance of these alleged violations.

49.     Each Defendant was the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

50.     References to a corporate family or companies by a single name in conspiracy allegations constitute allegations that one or more employees or agents of entities within the corporate family undertook conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know their counterparts' corporate affiliations, nor did they recognize distinctions between entities within a corporate family. Thus, all Defendant entities within the corporate families were knowing and active participants in the conspiracy to maintain supra-competitive prices of Frozen Potato Products.

### V.     FACTUAL ALLEGATIONS

**A.     The Frozen Potato Products Market.**

51.     The United States is the fifth-largest producer of potatoes in the world, producing 44 billion pounds of potatoes in 2023 alone. Roughly 70 percent of these potatoes are sold in bulk to potato processors—primarily to Defendant Processors—for use in potato products like potato

chips, dehydrated potatoes, and the Frozen Potato Products at issue in this case. The remainder are sold for other uses, such as livestock feed, table stock, or seed sales.

52.     Defendant Processors and other potato processors use most of their purchased potatoes to make Frozen Potato Products. As a result, roughly 40 percent of the potatoes produced in the United States will ultimately be used in Frozen Potato Products—17.6 billion pounds of the 44 billion pounds produced in 2023. The market for Frozen Potato Products was approximately $68 billion in 2023, with that figure expected to grow to as much as $92.6 billion by 2030.

53.     Frozen french fries provide the largest part of the Frozen Potato Products market. Along with french fries, the Frozen Potato Products market includes hash brown, tater tots, and potatoes that are frozen and shaped in other formats. The average American consumer, according to one estimate, consumes nearly 48 pounds of Frozen Potato Products each year.

54.     Raw potatoes are converted into Frozen Potato Products through a multi-step process involving specialized machinery. Often, the first step often consists of washing and peeling the potatoes with a brush roller washing and peeling machine. The potatoes are then trimmed and smoothed before cutting. After the potatoes are cut, subsequent steps include grading, blanching, dewatering, and freezing. When the process is complete, the resulting products are bagged and prepared for distribution.

55.     Defendant Processors sell Frozen Potato Products to many different customers through numerous distribution streams. Buyers include the food service industry—such as hotels, restaurants, schools, and hospitals—and retail buyers like grocery stores and convenience stores. Food distributors may purchase Frozen Potato Products from potato processors and resell those products. This case is brought by Plaintiffs who purchased Frozen Food Products for personal consumption, primarily from grocery stores and other retailers.

**B.    Defendants Repeatedly Coordinated Nearly Identical Price Hikes of Frozen Potato Products During the Class Period.**

56.    Frozen Potato Products do not differ significantly in appearance, quality, or use. As a result, Frozen Potato Products are functionally interchangeable commodity products. In a competitive industry with such products, price represents the primary means of competition, leading to price differentiation among pricing between competitors. Yet in the market for Frozen Potato Products, the opposite occurred—several producers with near-total market control coordinated nearly identical price hikes for several years, resulting in unprecedented profit margins despite significantly declining input costs.

**1.    Prices for Frozen Potato Products Rose Dramatically Because of Defendants' Collusion.**

57.    Defendants conspired to fix the price of Frozen Potato Products throughout the Class Period. Upon information and belief, Defendants engaged in a detailed exchange of competitively sensitive information to implement this conspiracy. These exchanges allowed Defendants to make near-concurrent and near-identical price increases without fear of losing market share to price competition. Because Defendant Processors collectively control nearly 98% of the Frozen Potato Products market, their price impact changes essentially dictate industry-wide prices.

58.    Price increase letters issued by Defendant Processors noted the number of price increases and the effective date of those increases. For example, in January 2021, J.R. Simplot and McCain issued increased the price of Frozen Potato Products by 4 cents per pound through a price increase letter.

59.    Defendant Processors' Frozen Potato Product prices increased in 2021 before skyrocketing in 2022. The prices remain high through at least the end of July 2024, which has created unparalleled margins for Defendants. Stock analysts writing in May 2023, unaware of

Defendants' collusion, predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not be "durable longer term." Because of the alleged conspiracy, however, this prediction was erroneous.

60.     The FRED data from the Federal Reserve Bank of St. Louis show that as of August 1, 2024, Frozen Potato Products prices were at their highest recorded level since 1967. The data are indexed at 100 set in 1982. Compared to that 1982 setting, as of August 1, 2024, Frozen Potato Product prices stood at 434.147.



61.     From July 2022 to July 2024, Frozen Potato Product prices increased 47%. Cost inputs cannot explain these increased prices, because during that same two-year period, Defendants' input costs *declined*. These input costs peaked around the third quarter of 2022, and declined substantially after that, yet Defendants' Frozen Potato Product prices continued to rise. Indeed, Defendants' prices remained near their peak from October 2023 through at least July 2024 despite a roughly 33% decline in input costs. This indicates that Defendants have collusively raised and fixed their product prices, including after their input costs declined.

2. **Defendants' Exchange of Competitively Sensitive Data and Close-Knit Relationships Enabled Price Coordination.**

*PotatoTrac.*

62.     All Defendant Processors participate in PotatoTrac. PotatoTrac is an industry service run through NPD Group, Inc., now known as Circana. Circana is a corporation which "provides market information, tracking, analytic, and advisory services to help clients in making better business decisions." Defendants either sell or supply their company-specific data to NPD Group, Inc. PotatoTrac/NPD then sends the Defendant Processors one another's market share information. Indeed, Potato Trac's only commercial clients are the four Defendant Processors.

63.     From 2008 through the present day, Circana has collected and continues to collect proprietary pricing data on all potato products sent from manufacturers to food service outlets— including restaurants, schools, and hospitals. Unlike "retail scanner data," PotatoTrac data is "instead gathered via a survey of food service suppliers."[15] One report described PotatoTrac as "a cooperative, wholesale and foodservice measurement service providing [individual item] level data for all frozen potato shipments from the four major frozen potato processors—Cavendish, Lamb Weston, McCain and JRS—to all U.S. foodservice customers as well as foodservice exports from the U.S. to foreign countries."[16]

64.     On information and belief, PotatoTrac also includes company projections. The Defendants willingly share their commercial data and information with PotatoTrac/NPD, knowing that the only other commercial industry participants are their competitors in the Frozen Potato Products market. Exchanging and monitoring each other's "share" information disincentivizes

---

[15] http://dairyprogramhearing.com/getfile65226522.pdf?dDocName=STELPRDC5088455.

[16] https://www.potatogrower.com/2009/02/potatotrac-reports-give-marketing-data.

Defendants from competing on price or for market share. Instead, Defendants can, through their conspiracy, maintain artificially high prices for Frozen Potato Prices.

*NPPB.*

65. Defendants also use NPPB, which allows Defendant Processors to efficiently communicate with each other, to carry out their conspiratorial objectives.

66. NPPB disseminates joint marketing, provides export sales updates and, critically, facilitates the exchange of data between the Defendant Processors.

67. NPPB's quarterly reports provide access to PotatoTrac data. This data, in turn, allows Defendants to coordinate lockstep movement of prices to supra-competitive levels.

68. In addition, the NPPB imposes two types of assessments on its members. First, each potato producer pays an assessment on the quantity of potatoes that it produces. Second, the NPPB imposes a $0.03 per hundredweight assessment for potatoes imported into the United States. Both assessments are significant.

69. Each assessment furthers the conspiracy. The first assessment, based on the amount of potatoes produced, gets each producer to buy in to the conspiracy to keep its facilitator financially afloat. The second assessment penalizes imports, which financially deters increased supply (and commensurate price decreases) in the Frozen Potato Market.

**3. Defendants Imposed Lockstep Price Increases.**

70. Frozen Potato Products price hikes in 2021 and 2022 were the result of Defendant Processors' imposition of matching, simultaneous, or near-simultaneous price increases on customers.

71. Acting in concert, the four Defendant Processors—controlling nearly 98% of the Frozen Potato Products market—have extraordinary market power and can control pricing. If these

Defendants collectively raise their prices, that increase drives a corresponding increase in the market price.

72.     If each Defendant acted individually, raising and maintaining Frozen Potato Products prices would risk competitors undercutting prices to gain market share. Competition would not permit one Frozen Potato Products manufacturer to elevate its prices to extreme levels; competitors would swoop in, undercut that price, and take market share. That is why analysts erroneously predicted that Lamb Weston's "stepped-up margin expansion" would not be "durable longer term." In other words, Defendants' price increase actions described in this Complaint are flatly inconsistent with their individual interests in a non-collusive, competitive market. By colluding, however, Defendants change their incentives and the functioning of the relevant market. The collusive prices increases enacted by Defendants demonstrate that Defendants were driven by their collective interests rather than their individual motivations.

73.     On information and belief, before the conspiracy, Defendants' price adjustments focused on their individual company's profits. That changed, however, in January 2021.

74.     Potato Expo 2021 was held as a virtual event by the National Potato Council from January 5, 2021 to January 7, 2021. "Each year," according to the Council, "the Potato Expo brings together growers, suppliers and industry experts to make the largest conference and trade show for the potato industry."

75.     Also in January 2021, J.R. Simplot and McCain each sent price increase letters to their customers within one day of each other. The letters stated that the cost of Frozen Potatoes would increase by $0.04 per pound. The letters shared an identical effective date of March 15, 2021.

76.     In February 2021, McCain announced a price increase. J.R. Simplot and Cavendish Farms quickly followed suit and announced price increases. Although Lamb Weston did not

formally announce a price increase that month, it increased prices—albeit quietly—in that same timeframe.

77.     J.R. Simplot's Sales Director recognized that Simplot once considered pricing annually, but then started to increase prices more often. Indeed, during this period, Defendants began a series of coordinated, regular, and seriatim price increases.

78.     Lamb Weston and McCain sent price increase letters within two weeks of each other in May 2021. Lamb Weston's letter stated that the price of Frozen Potatoes would increase by $0.08 per pound; the McCain letter stated that the price of Frozen Potatoes would increase by $0.04 per pound. The Lamb Weston and McCain letters had effective dates of July 1, 2021 and July 15, 2021, respectively. Then, on June 4, 2021, Cavendish sent price increase letters indicating that the price for Frozen Potatoes would increase by $0.04 per pound. That letter had an effective date of July 15, 2021—the same effective date that was indicated by McCain's letter.

79.     In September 2021, when discussing a coming Lamb Weston price hike, Lamb Weston's former Vice-President predicted that McCain—ostensibly a competitor—would welcome and mirror the increase, saying "it will probably be exactly the price increase that McCain wanted, which was $0.04 on A grade and $0.02 they will announce a price increase."

80.     In a span of five days in October 2021, Lamb Weston, McCain, and Cavendish each sent price increase letters. The letters all indicated that the cost of Frozen Potatoes would increase by $0.08 per pound.  Each letter also had the same effective date of December 15, 2021.

81.     In February of 2022, in a span of five days, each Defendant Processor sent price increase letters. The letters had the same effective date: April 1, 2022.

82.      Lamb Weston stated, on February 11, 2022, that it would raise prices as of April 2022.  Specifically, it announced increased prices on "battered and coated" products by 12 cents per pound and of 10 cents per pound on non-battered products.

83. On February 15, 2022—just four days later—J.R. Simplot announced identical increases on the same two types of products. The same day, McCain announced a 12 cent per pound price hike on all its frozen potato products.

84. The next day, on February 16, 2022, Cavendish Farms announced a price increase of 12 cents per pound for battered and coated frozen potatoes, "formed items," and non-battered frozen potatoes.

85. Shortly thereafter, on April 8, 2022, Cavendish sent a letter outlining that the cost of Frozen Potatoes would increase by $0.07 per pound. That increase was effective on May 15, 2022.

86. On April 19, 2022, the owner of Washington, D.C. restaurant Ivey and Coney posted on X (formerly Twitter) that the restaurant had been informed by the Defendants of uniform price increases effective on April 4, 2022.[17] The post stated: "Amazing how all of the major suppliers for French Fries and the like are all raising their prices at the same time and by the same amount." Incredulous, the post added: "Totally not collusion or anything, right?" Defendants' price hikes for their Frozen Potato Products were remarkably similar, as can be seen in this chart:

| Frozen Potato Product Price Increases, Effective April 4, 2022 | | | | | |
| --- | --- | --- | --- | --- | --- |
| | Potato Products | Coated Potatoes | Roasted / Vegetable Products | Sweet Potato Products | Onion/ Onion Rings |
| Lamb Weston | 0.12 | 0.12 | 0.12 | 0.12 | |
| McCain | 0.12 | 0.12 | 0.12 | 0.12 | 0.23 |
| Cavendish | 0.12 | | 0.15 | | 0.23 |
| Simplot | 0.10 | 0.12 | 0.15 | 0.12 | |

---

[17] Tweet, Insta@ivyconey, X (April 19, 2022), https://x.com/ivyandconey/status/1516525216641466368.

87.     In addition, J.R. Simplot's Sales Director acknowledged these lockstep price hikes, explaining that in 2022, "that's what we did . . . like Lamb, they did the $0.10 and $0.12 like we did in April of 2022." He explained that after J.R. Simplot initiated a price increase in May 2022, Lamb initiated similar price increases of $.08 and $.10 in July 2022.

88.     On information and belief, in furtherance of the conspiracy, McCain began to ignore its contractual obligations in 2022 and increased all prices to create a 30% margin, regardless of the contracts' remaining durations. This represents a colossal margin that would not be capturable if a company had to compete on price in a non-collusive market. The price increase, implemented by McCain's upper-level management, could only be enforced because customers had no bargaining power and nowhere else to turn.

89.     Indeed, these substantial price increases implemented by McCain and Lamb Weston were only possible because of the pricing solidarity of Cavendish Farms and J.R. Simplot. Absent this coordination between the dominant market participants, an individual company's price increase would have been undercut by the other competitors. Those competitors, in a typical market, would have lowered prices, won sales, and gained market share. Defendants have continued to coordinate their price hikes, and have collectively raised and maintained prices at supra-competitive levels. In 2023, for example, the Director of Sales Solutions for J.R. Simplot acknowledged that Lamb Weston raised prices by 35% and explained that J.R. Simplot, McCain, and Cavendish were similarly continuing to "push pricing" rather than "going after new business." These acts have been to the detriment of Plaintiffs.

90.     The margins that Defendants currently enjoy are only possible because of their conspiracy. In 2023, for example, a former VP at Lamb Weston acknowledged that Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry." He explained that Defendants "absolutely" have "no incentive to fight that hard for each

other's share"; instead, they are all "behaving themselves" to maintain high margins. He remarked that "I think we've done a pretty good job at taking margins with these price increases."

91.　　A statement by a former Senior Director at McCain Foods' 2024 similarly reflected his understanding of the benefits provided by price coordination. He explained that McCain did not wish to compete on the price of battered fries with Lamb Weston. Although the former Director noted that he had originally thought McCain should compete and pursue more market share for that product, "the higher ups in the room" had said not to risk it.[18] J.R. Simplot's Director of Sales likewise brushed off customer threats to switch to one of Simplot's competitors after Simplot increased its prices: understanding that competitors' prices were similar, "we knew we weren't worried about it." Defendants trusted their pricing solidarity and knew their co-conspirators would not lower prices to gain market share.

92.　　In sum, Defendants' collusive, coordinated price hikes—even as their input costs plummeted—created significant benefits for them and damaged the Plaintiffs. As Lamb Weston's Former VP of International put it, the Defendants had "never ever seen margins this high."

**C.　The Frozen Potato Product Industry Has Features that Make It Susceptible to Collusion.**

93.　　Economists, the United States Department of Justice (DOJ), and the United States Federal Trade Commission (FTC) all recognize that certain economic markets are more susceptible to collusion than others. Generally, it is easier for competitors to collude in markets with any of the following features: (1) high concentration (i.e., the market is dominated by a few large sellers); (2) high barriers to entry; (3) the industry produces a product with low demand elasticity; (4) the industry produces a product with no close substitutes; (5) the industry produces

---

[18] This incident also shows that Defendants' pricing policies came from executives above the Senior Director level.

a relatively homogenous commodity product; and (6) the employees of different companies in the industry have established social or professional relationships. These features are present in the Frozen Potato Product industry.

### 1. The Frozen Potato Industry Is Highly Concentrated.

94.     The market for Frozen Potato Products is highly concentrated, with just four companies producing 97 to 98 percent of Frozen Potato Products: Lamb Weston Holdings controls (40%); McCain Foods Ltd. (30%); J. R. Simplot Co. (20%); and Cavendish Farms (7% to 8%).

95.     The significant degree of concentration in the Frozen Potato Products industry can be measured with the Herfindahl-Hirschman Index, or "HHI." As the DOJ has explained, the HHI is "a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers."[19] The HHI "approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm."[20] According to the 2023 DOJ/FTC Merger Guidelines, a market is considered highly concentrated if it has an HHI greater than 1,800. The Frozen Potato Products market has an estimated HHI that exceeds 2,900. In other words, the market easily qualifies as highly concentrated.

### 2. Barriers to Market Entry Are High.

96.     Barriers to entry are obstacles that prevent new companies from forming in a particular industry. Barriers to entry sustain collusion by making it harder for new market

---

[19] https://www.justice.gov/atr/herfindahl-hirschman index#:~:text=The%20term%20%E2%80%9CHHI%E2%80%9D%20means%20the,then%20summing%20the%20resulting%20numbers.

[20] *Id.*

participants to open a business that would compete with the colluding firms. There are several barriers to entry in the market for Frozen Potato Products.

97.     First, opening a new frozen potato processing plant costs hundreds of millions of dollars and can take two years to complete. For example, in September of 2017, Cavendish announced that it broke ground on a $360 million frozen potato processing plant in Canada. Further illustrating the expense of constructing potato processing facilities, in August 2023, Lamb Weston announced that it was spending at least $415 million to extend capacity at an existing plant by 40%.

98.     In addition, any new entrant into the Frozen Potato Product market would need to acquire scarce inputs. For instance, a new Frozen Potato Product company would have to acquire potatoes (ideally at a low cost), but Defendants have already cultivated relationships with the potato growers in low-cost areas of the United States such as Idaho. These potato farmers might be unwilling to gamble on a new business relationship with a new Frozen Potato Product company instead of relying on relationships with Defendants.

### 3.     Frozen Potato Products Have Low Demand Elasticity.

99.     "Demand elasticity" is a measure of how sensitive purchasers are to changes in the price of a product. If a product has high demand elasticity, then an increase in the price of the product will cause a relatively large decrease in the quantity of that product that customers purchase. By contrast, if a product has low demand elasticity (i.e., if the demand for the product is "inelastic") an increase in the price of a product will cause a relatively small decrease in the quantity of the product that customers purchase. When a product has low elasticity of demand, colluding defendants can raise prices above competitive levels without losing too many customers for the price hike to be profitable.

100.     Frozen Potato Products have a low demand elasticity. Potato products are

enough of a staple in consumers' diet that grocery stores will keep stocking them—and consumers will keep buying them—in the face of price increases. A recent report by Potatoes USA found that "the demand for potato products is becoming more inelastic. This is a good thing for the US potato industry as inelasticity suggests greater price power, and less volatility of the quantity demanded by consumers to changes in producer costs."

**4. Frozen Potato Products Do Not Have Close Substitutes.**

101.    When a product has no close substitutes, customers are more likely to buy the product at supracompetitive prices (because they have no good alternatives). And when customers are willing to pay supracompetitive prices, the makers of that product will have a stronger incentive to collude, as well as a better chance of sustaining their collusion. Frozen Potato Products have no close substitutes: grocery stores and consumers who want to buy frozen potatoes, hashbrowns, or tater tots do not view other frozen vegetables (or any other products) as good alternatives.

**5. Frozen Potato Products Are Relatively Homogeneous Commodities.**

102.    When a product is a homogenous commodity, it is easier for firms to collude to raise the price of that product. When all firms in the industry are producing the same products, it is easier for them to agree on prices for those products. It is also easier to tell whether any firms are cheating on a collusive agreement, because each firm in the industry will know that, if a rival deviates from the agreed upon price for a product, the rival is cheating, and not simply offering a different price to account for a difference in the quality or features of the product the rival is producing. The United States Department of Agriculture has determined that Frozen Potato Products are commodities that must satisfy the same specifications.

**6. Defendants' Executives Have Social and Business Relationships.**

103.    Collusion opportunities make price-fixing easier. That is because those seeking to engage in collusion can use otherwise legitimate opportunities to discuss prices and production.

- 26 -

As a result, regular opportunities for communications among competitors can represent circumstantial evidence of price-fixing. In this case, the co-packing arrangements and trade association meetings that are features of the Frozen Potato Products industry provided Defendants with collusion opportunities.

104.    "Co-packing" arrangements are agreements through which a manufacturer outsources part of its production to another company before selling the products made by that other company. When manufactures discuss these arrangements, they also have an opportunity to discuss prices and production quantities with each other.

105.    Lamb Weston has stated that it uses co-packing arrangements, which it calls "a common industry practice," to source some of its production to other companies. According to Lamb, there "are a limited number of competent, high-quality co-packers in the industry."

106.    Additionally, Defendants share membership in multiple industry trade organizations. One such organization, of which McCain, Lamb Weston, and J.R. Simplot are all members, is the Potato Association of America. The Potato Association of America's "paramount objective" is the "collection and dissemination of the best available technical and practical information relating to all aspects of potato production, biology, and utilization," and it "serves as the official professional society for those involved in potato research, extension, production, and utilization." Each year, the Association hosts a multi-day meeting of industry participants, including Defendants. For example, the Association held its 2022 meeting in July 2022, in Missoula, Montana, its 2023 annual meeting in July 2023 in Charlottetown, Prince Edward Island, and its 2024 meeting in Portland, Oregon. The 2025 meeting is scheduled for July 27 to 31, 2025, in Madison, Wisconsin.

107.    The Defendant Processors are also all members of the National Potato Council. The Council "is the voice of U.S. potato growers and industry members" in Washington D.C. It protects

and advances the interests of potato growers in Washington, D.C. It does so "by addressing issues that affect the potato industry, from policy issues debated in Congress to regulatory issues proposed by federal agencies."

108. The Council held its Potato Expo 2021 from January 5, 2021 to January 7, 2021 as a virtual event. "Each year," as the Council explained, "the Potato Expo brings together growers, suppliers and industry experts to make the largest conference and trade show for the potato industry."

109. This conference's timing coincided with the price increase letters sent by J.R. Simplot and McCain within one day of each other in January 2021. These letters stated that the cost of Frozen Potatoes would increase by $0.04 per pound. Simplot also stated that the price of line flow potato products would increase by $0.02 per pound. The McCain and Simplot letters each indicated an identical effective date of March 15, 2021.

110. Additionally, the Defendant Processors have executives on the Potato Sustainability Alliance's board of directors. As of November 4, 2024, Richard Burres (Lamb Weston), Audrey Leduc (McCain Foods), John MacQuarrie (Cavendish Farms), and Jolyn Rasmusen (J.R. Simplot) sit on that board of directors.

111. Defendant Processors' executives also sit on the board of directors of the American Frozen Food Institute. The Institute's 2024 board of directors includes Tina Almond (McCain), Michelle Damon (J.R. Simplot), Peter D. Johnston (Cavendish Farms), and Jennifer Weekes (Lamb Weston).

112. The Institute describes its "AFFI-CON" event as the "premier frozen ingredients show that brings together over 500 companies and 1,500+ attendees in a single location, allowing them to meet one-on-one to discuss current and future business opportunities. The average attendee

will have 40+ private business meetings that will lay the foundation for their year." The next meeting is scheduled for February 22 to 25, 2025 in Dallas, Texas.

113.    Co-packing arrangements, contact at the above-described industry trade events, and serving together on relevant boards provided Defendants opportunities to meet and conspire about their prices for and production of Frozen Potato Products. Additionally, because of these contacts, Defendants' executives knew where their co-conspirators bought and sold their Frozen Potato Products.

## VI.    INTERSTATE TRADE AND COMMERCE

114.    Beginning at least as early as January 1, 2021, and continuing through the present, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act. During the Class Period, Defendants sold substantial quantities of Frozen Potato Products in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where Defendants produced their Frozen Potato Products.

115.    Defendant's conspiracy had a direct, substantial, intended, and foreseeable impact on interstate commerce in the United States and its territories. Economic studies estimated the Frozen Potato Products market transacted over $65 billion in 2022 and predicted it would grow to over $92 billion by 2030. The Defendants' own facilities in the United States made and sold products in the United States. Further, Defendants knew that their Frozen Potato Products would enter the United States stream of commerce and would affect United States commerce, including harm to Plaintiffs and the proposed classes in the payment of supra-competitive prices for Frozen Potato Products. To the extent any Defendant sold Frozen Potato Products from Canada into the United States, those sales constitute import commerce into the United States, and Defendants' price-fixing had a substantial intended effect on United States import commerce by increasing the prices that buyers paid for Frozen Potato Products.

116.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for Frozen Potato Products in the United States.

117.    Defendants' unlawful conduct described herein caused inflated prices for Frozen Potato Products in the United States, and within those States.

118.    Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of Frozen Potato Products sold in the United States, the price of Frozen Potato Products would have been determined by a competitive market.

## VII.    ANTITRUST INJURY

119.    Defendants' antitrust conspiracy had the following effects, among others:

    (a)    Price competition has been restrained or eliminated with respect to the pricing of Frozen Potato Products;

    (b)    The prices of Frozen Potato Products have been fixed, raised, maintained, or stabilized at artificially inflated levels;

    (c)    Purchasers of Frozen Potato Products have been deprived of the benefits of free and open competition; and,

    (d)    Plaintiffs and other Class members have paid higher and artificially inflated prices for Frozen Potato Products as a direct, foreseeable and proximate result of Defendants' conduct.

120.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of Frozen Potato Products.

121.    Defendants' contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

122. The precise amount of the overcharge impacting the prices of Frozen Potato Products paid by Plaintiffs and the Classes can be measured and quantified using well-accepted models.

123. By reason of the alleged violations of the antitrust laws, Plaintiffs and the other members of the Classes have sustained injury to their business or property, having paid higher prices for Frozen Potato Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII. TOLLING OF THE STATUTES OF LIMITATIONS

124. Plaintiffs and other Class members' purchases of Frozen Potato Products within four years prior to the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

125. Defendants committed, or continued to commit, their antitrust violations within applicable periods of limitation. Defendants increased their prices and caused Plaintiffs and other Class members to pay supra-competitive prices because of those price increases. Because Defendants committed overt acts in furtherance of their conspiracy and their antitrust violation within any applicable period of limitations, Defendants committed a continuing violation of the antitrust laws.

126. As described herein, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct and used pretextual justifications to justify their price increases. Further, price-fixing conspiracies like Defendants' conspiracies are inherently self-concealing.

127.    On information and belief, at least Lamb Weston told its managers to communicate about competitor pricing and business intelligence using texting instead of emails to avoid creating emails that could be discovered in the event of an antitrust investigation. Although Lamb Weston managers obtained their competitors' price announcements, the managers were forbidden to email such announcements to C-suite executives so the latter could more plausibly deny receiving information about the announcements.

128.    Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiffs and the Classes, the four-year statutes of limitations governing claims under the Sherman Act were tolled pursuant to the doctrine of fraudulent concealment.

## IX.    DEFENDANTS ARE NOT IMMUNE

129.    The Capper-Volstead Act, passed in 1922 as the Co-operative Marketing Associations Act (P.L. 67-146)(7 U.S.C. §§ 291, 292), grants certain agricultural producers an exemption under the antitrust laws when these producers are acting "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products. Capper-Volstead Act, § 1. These agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes." Id.

130.    The Capper-Volstead Act allows these producers, as part of the cooperative association, to agree on prices and terms of sale, engage in joint marketing activity, agree on common marketing practices with other cooperatives, engage in other combined activities to promote market efficiency, which absent the Act, would run afoul of the Sherman Antitrust Act.

131.    Immunity under the Capper-Volstead Act is not absolute; it extends only to organizations or cooperatives whose membership consists exclusively of producers of agricultural products and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members.

132.    Further, Capper-Volstead requires that protected cooperatives be "operated for the mutual benefit of the members thereof" and limits the immunity provided by the Act to cooperatives that afford equal corporate suffrage rights to its members, providing "that no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein." The limited protections of the Capper-Volstead Act evaporate unless the organization engaging in the coordinated efforts is exclusively made up of producers. If even one member of a cooperative organization is not a producer, the limited protection of the Capper-Volstead Act will not apply. Even if an individual producer independently qualifies as a Capper-Volstead entity, that individual producer loses Capper-Volstead immunity upon conspiring with a non-Capper-Volstead entity.

133.    The plain language of the Capper-Volstead Act affords no immunity for pre-production output restraints: Congress did not grant the cooperatives the power to restrict supply, only the power to assist producers in marketing the available supply of agricultural products. USDA itself has recognized in various published documents that it is illegal for cooperatives to restrain members' production.

134.    Here, Capper-Volstead flatly does not apply.

135.    Defendants' activities were anticompetitive and predatory. The Defendants' conduct does not include activities that promote market efficiency and have no legitimate business justification. The sole purpose of the conspiracy is to artificially increase the downstream sales price of FPPs in the United States.

136.    Additionally, NPPB consists of members whom are importers, and, therefore, are non-Capper-Volstead protected entities. Further, Defendant Processors each participate in the downstream processing, marketing and transportation of their products, which means that they are not Capper-Volstead protected entities either.

## X.      CLASS ACTION ALLEGATIONS

137.      Plaintiffs bring this action for damages and injunctive relief on behalf of itself and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), with the class initially defined to include (the "Nationwide Class"):

> All persons or entities that indirectly purchased Frozen Potato Products from one or more Defendants or co-conspirators for personal consumption within the United States from January 1, 2021, until the time that the adverse effects of Defendants' anticompetitive conduct cease (the "Class Period").

138.      Plaintiffs also bring this action on behalf of themselves, and all others similarly situated, as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class ("the Multi-State Class"):

> All persons or entities that purchased Frozen Potato Products from one or more Defendants or co-conspirators for personal consumption in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, D.C., Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin during the Class Period.

139.      The Nationwide Class and the Multi-State Class specifically exclude the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; (e) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (f) the judges and chambers staff in this case, as well as any members of their immediate families; and (g) all jurors assigned to this case.

140.    Plaintiffs reserve the right to modify or amend the definition of the classes before the Court determines whether certification is appropriate.

141.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**: Plaintiffs do not know the exact number of Class members because such information presently is in the Defendants' exclusive control. But Plaintiffs believe that based on the nature of the trade and commerce involved, there are (at least) many thousands of Class Members dispersed throughout the United Staes and the states identified above, making joinder of all Class Members impracticable.

142.    **Common Questions Predominate, Fed. R. Civ. P. 23(a)(2) and (b)(3)**: Numerous questions of law and fact are common to the Classes related to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including:

    a.    Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for Frozen Potato Products during the Class Period;

    b.    Whether such agreements constituted violations of the Sherman Antitrust Act;

    c.    The identity of the participants of the alleged conspiracy;

    d.    The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

    e.    Whether Defendants fraudulently concealed their misconduct;

    f.    Whether and to what extent Defendants' anticompetitive scheme inflated prices of Frozen Potato Products above competitive levels;

    g.    The effect of Defendants' alleged conspiracy on the prices of Frozen Potato Products in the United States and the states identified above during the Class Period;

    h.    The nature and scope of injunctive relief necessary to restore competition; and

    i.    The measure of damages suffered by Plaintiffs and the Damages Class.

143.    These and other questions of law or fact that are common to the members of the Classes predominate over any questions affecting only individual members of the Classes. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

144.    **Typicality, Fed. R. Civ. P. 23(a)(3):** Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs' claim arises from the same common course of conduct giving rise to the claims of the Classes, and the relief sought is common to the Classes.

145.    Plaintiffs and the other Class members were injured by the same unlawful conduct, which resulted in their paying more for Frozen Potato Products than they would have in a competitive market.

146.    **Adequacy of Representation, Fed. R. Civ. P. 23(a)(4)**: Plaintiffs will fairly and adequately represent the interests of the Classes because Plaintiffs purchased Frozen Potato Products directly from Defendants within the United States during the Class Period. Plaintiffs have no material conflicts with any other members of the Classes that would be antagonistic to those of the other members of the Classes. Plaintiffs seek no relief that is adverse to the interests of other members of the Classes, and the infringement of rights and damages Plaintiffs sustained are typical of those of other members of the Classes. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation. Plaintiffs intend to prosecute this action vigorously.

147.    **Common Grounds for Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**: Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

148.    **Superiority, Fed. R. Civ. P. 23(b)(3):** Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment

will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Classes to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Classes is impractical, and the prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

149.    This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT ONE

### VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1, 3

### RESTRAINT OF TRADE
### (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF)

150.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

151.    From at least January 1, 2021 until the effects of their unlawful conduct cease, Defendants entered into and engaged in a contract, combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) by artificially restraining competition with respect to the price of Frozen Potato Products sold within the United States.

152.    The contract, combination or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for Frozen Potato Products in the United States.

153.    In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

(a)    exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of Frozen Potato Products sold in the United States;

(b)    participating in meetings, conversations, communications, and using mechanisms among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of Frozen Potato Products sold in the United States;

(c)    participating in meetings, conversations, and other communications among themselves to implement, adhere to, and police the agreements they reached;

(d)    engaging in conduct designed to raise and stabilize the prices of Frozen Potato Products sold on the spot market and pursuant to contracts.

154.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to fix, maintain, raise, or stabilize prices of Frozen Potato Products.

155.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and maintain the price of Frozen Potato Products.

156. Defendants' activities constitute a per se violation of Sections 1 and 3 of the Sherman Act.

157. Defendants' conspiracy had the following effects, among others: (a) Price competition in the market for Frozen Potato Products has been restrained, suppressed, and/or eliminated; (b) Prices for Frozen Potato Products provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; (c) Plaintiffs and members of the Class who purchased Frozen Potato Products from Defendants and their co-conspirators have been deprived of the benefits of free and open competition; and (d) purchasers of Frozen Potato Products paid artificially inflated prices.

158. Defendants' production restrictions, price-fixing, and other actions in furtherance of their conspiracy, as Defendants intended, directly, substantially, and foreseeably increased prices that purchasers paid in the United States for Frozen Potato Products produced in or imported into the United States.

159. Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for Frozen Potato Products purchased from Defendants than they would have paid in the absence of the conspiracy. As a direct and proximate result, Plaintiffs and other members of the Class have suffered damages in an amount to be determined at trial. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

160. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

## COUNT TWO

## VIOLATION OF THE SHERMAN ACT, 15 U.S.C. § 1, 3

## CONSPIRACY TO EXCHANGE COMPETITIVELY SENSITIVE INFORMATION
### (ON BEHALF OF NATIONWIDE CLASS FOR INJUNCTIVE AND EQUITABLE RELIEF)

161.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

162.    From at least January 1, 2021 until the effects of their unlawful conduct cease, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information regarding Frozen Potato Products. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

163.    The relevant market is the product market for Frozen Potato Products, and the relevant geographic market is the continental United States.

164.    Defendants' regular information exchanges through PotatoTrac reflected an independent concerted action between horizontal competitors in the Relevant Market. Indeed, each Defendant Processor furnished competitively sensitive information with the understanding it would be reciprocated.

165.    Circana (and before it, NPD) enforced this understanding by requiring Defendants to share data in order to receive comparable data. The agreement to regularly exchange price, supply, and production information through PotatoTrac suppressed competition between the Defendants and could not have been done without the assistance of Circana.

166.    The strategic information obtained through PotatoTrac was a material factor in the decisions to inflate prices for Frozen Potato Products during the Class Period.

167. Defendants' unlawful agreements to exchange this data was not reasonably necessary to further any procompetitive purpose.

168. The information exchange has had the effect of (1) reducing and suppressing competition among Defendants in the market for Frozen Potato Products and (2) inflating the price of Frozen Potato Products during the Class Period. As a result of this conduct, Plaintiff and Class members have been injured in their business or property by paying artificially inflated prices for Frozen Potato Products during the Class Period.

169. For this conduct, Plaintiffs and members of the Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

## VIOLATIONS OF STATE LAW

170. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

171. The following Counts Three through Thirty-Four are pleaded under the laws of each State or jurisdiction indicated below, on behalf of the Multi-State Class.

### COUNT THREE

### VIOLATION OF ALABAMA'S ANTITRUST ACT, ALA. CODE §§ 6-5-60, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ALABAMA)

172. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

173. In violation of Ala. Code. §§ 6-5-60 *et. seq.*, Defendants' price-fixing agreements unreasonably restrain trade in the relevant market for Frozen Potato Products.

174. Defendants' violations of Alabama law were flagrant and willful.

175. The Class has been injured in its business or property in Alabama by Defendants' violations of Ala. Code. §§ 6-5-60 *et. seq.*

## COUNT FOUR

### VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. §§ 44-1401, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ARIZONA)

176.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

177.     In violation of Ariz. Rev. Stat. § 44-1402, Defendants' price-fixing agreements unreasonably restrain trade in the relevant market for Frozen Potato Products.

178.     Defendants' violations of Arizona law were flagrant and willful.

179.     The Class has been injured in its business or property in Arizona by Defendants' violations of Ariz. Rev. Stat. § 44-1402.

## COUNT FIVE

### VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT, ARK. CODE ANN. §§ 4-88-101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ARKANSAS)

180.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

181.     In violation of Ark. Code Ann. §§ 4-88-101 *et. seq.*, Defendants' price-fixing agreements unreasonably restrain trade in the relevant market for Frozen Potato Products and mislead consumers into believing the price of Frozen Potato Products was the result of a competitive and free market.

182.     Defendants' violations of Arkansas law were substantively unconscionable because Defendants' price-fixing agreements benefitted Defendants at the expense of Plaintiffs and Class Members.

183.     The Class has been injured in its business or property in Arkansas by Defendants' violations of Ark. Code Ann. §§ 4-88-101 *et. seq.*

- 42 -

## COUNT SIX

### VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,
### CAL. BUS. & PROF. CODE § 16700, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN CALIFORNIA)

184.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

185.     Defendants entered into unlawful price-fixing agreements that are illegal "trusts," within the meaning of Cal. Bus. & Prof. Code § 16720. These agreements constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the] sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of Frozen Potato Products "shall be…controlled or established" (§16720(d)).

186.     Defendants' violations of California law were flagrant and willful.

187.     The Class has been injured in its business or property in California by Defendants' violations of Cal. Bus. & Prof. Code § 16720.

## COUNT SEVEN

### VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,
### CAL. BUS. & PROF. CODE § 17200, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN CALIFORNIA)

188.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

189.     Defendants' conduct described above constitutes unfair, unlawful, or fraudulent business acts or practices as proscribed by California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL").

190. Defendants' conduct is unethical, unscrupulous, against public policy, and violates fundamental rules of honesty and fair dealing.

191. Defendants' conduct is unfair because it violates Section 2 of the Sherman Act, and the strong California public policy against monopoly.

192. Defendants' conduct is unlawful, as it violates the spirit and letter of Section 2 of the Sherman Act, and California's common law prohibition on monopolies.

193. Plaintiffs and members of the Class lost money because they paid inflated prices for Frozen Potato Products, and seek the full extent of restitution available under the UCL.

## COUNT EIGHT

### VIOLATION OF COLORADO'S ANTITRUST ACT, COL. REV. STAT. § 6-4-104, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN COLORADO)

194. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

195. In violation of Colo. Rev. Stat. § 6-4-104, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

196. Defendants' violations of Colorado law were flagrant and willful.

197. The Class has been injured in its business or property in Colorado by Defendants' violations of Colo. Rev. Stat. § 6-4-104.

## COUNT NINE

### VIOLATION OF CONNECTICUT'S ANTITRUST ACT, CONN. GEN. STAT. § 35-24, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN CONNECTICUT)

198. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

199.     In violation of Conn. Gen. Stat. §§ 35-26, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

200.     Defendants' violations of Connecticut law were flagrant and willful.

201.     The Class has been injured in its business or property in Connecticut by Defendants' violations of Conn. Gen. Stat. §§ 35-26.

## COUNT TEN

### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT,
### D.C. CODE § 28-4501, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN THE DISTRICT OF COLUMBIA)

202.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

203.     In violation of D.C. Code §§ 28-4502, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

204.     Defendants' violations of District of Columbia law were flagrant and willful.

205.     The Class has been injured in its business or property in the District of Columbia by Defendants' violations of D.C. Code §§ 28-4502.

## COUNT ELEVEN

### VIOLATION OF THE FLORIDA DECEPTIVE AND
### UNFAIR TRADE PRACTICES ACT,
### FLA. STAT. § 501.201, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN FLORIDA)

206.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

207. In violation of Fla. Stat. § 501.204, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

208. Defendants' violations of Florida law were flagrant and willful.

209. The Class has been injured in its business or property in Florida by Defendants' violations of Fla. Stat. § 501.204.

## COUNT TWELVE

### VIOLATION OF THE HAWAII ANTITRUST STATUTE, HAW. REV. STAT. § 480-1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN HAWAII)

210. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

211. In violation of Haw. Rev. Stat. § 480-4, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

212. Defendants' violations of Hawaii law were flagrant and willful.

213. The Class has been injured in its business or property in Hawaii by Defendants' violations of Haw. Rev. Stat. § 480-4.

## COUNT THIRTEEN

### VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. 10/1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ILLINOIS)

214. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

215.     In violation of 740 Ill. Comp. Stat. 10/3, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

216.     Defendants made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling or maintaining the price paid for Frozen Potato Products in Illinois.

217.     Defendants fixed, controlled or maintained the sale or supply of Frozen Potato Products, for the purpose or with the effect of fixing, controlling or maintaining the price of Frozen Potato Products in Illinois.

218.     By contract, combination or conspiracy, Defendants unreasonably restrained trade or commerce for Frozen Potato Products in Illinois.

219.     Defendants' violations of Illinois law were flagrant and willful.

220.     The Class has been injured in its business or property in Illinois by Defendants' violations of 740 Ill. Comp. Stat. 10/3.

**COUNT FOURTEEN**

**VIOLATION OF THE IOWA COMPETITION LAW,
IOWA CODE §§ 553.1, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN IOWA)**

221.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

222.     In violation of Iowa Code §§ 553.4, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

223.     Defendants' violations of Iowa law were flagrant and willful.

224.    The Class has been injured in its business or property in Iowa by Defendants' violations of Iowa Code §§ 553.4.

## COUNT FIFTEEN

### VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT, KAN. STAT. ANN. §§ 50-101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN KANSAS)

225.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

226.    In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products. Defendants entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of Frozen Potato Products.

227.    Defendants' violations of Kansas law were flagrant and willful.

228.    The Class has been injured in its business or property in Kansas by Defendants' violations of Kan. Stat. Ann. §§ 50-101, *et seq.*

## COUNT SIXTEEN

### VIOLATION OF MAINE'S MONOPOLIES AND PROFITEERING LAW, ME. REV. STAT. ANN. TIT. 10, §§ 1101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MAINE)

229.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

230.    In violation of Me. Rev. Stat. Ann. tit. 10, § 1101, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

231.    Defendants' violations of Maine law were flagrant and willful.

232.     The Class has been injured in its business or property in Maine by Defendants'
violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

## COUNT SEVENTEEN

**VIOLATION OF THE MARYLAND ANTITRUST ACT,
MD. CODE COM. LAW § 11-204, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MARYLAND)**

233.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
allegation set forth in the preceding paragraphs of this Complaint.

234.     In violation of Md. Code Com. Law § 11-204, Defendants agreed not to compete.
These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen
Potato Products.

235.     Defendants' violations of Maryland law were flagrant and willful.

236.     The Class has been injured in its business or property in Maryland by Defendants'
violations of Md. Code Com. Law § 11-204.

## COUNT EIGHTEEN

**VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT,
MASS. GEN. LAWS. CH. 93A § 1, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MASSACHUSETTS)**

237.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every
allegation set forth in the preceding paragraphs of this Complaint.

238.     In violation of Mass. Gen. Laws. Ch. 93A § 2, Defendants agreed not to compete.
These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen
Potato Products.

239.     Defendants' violations of Massachusetts law were flagrant and willful.

240.     The Class has been injured in its business or property in Massachusetts by
Defendants' violations of Mass. Gen. Laws. Ch. 93A § 2.

## COUNT NINETEEN

### VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT,
### MICH. COMP. LAWS ANN. §§ 445.771, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MICHIGAN)

241. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

242. In violation of Mich. Comp. Laws Ann. § 445.772, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

243. Defendants' violations of Michigan law were flagrant and willful.

244. The Class has been injured in its business or property in Michigan by Defendants' violations of Mich. Comp. Laws Ann. § 445.772.

## COUNT TWENTY

### VIOLATION OF THE MINNESOTA ANTITRUST LAW,
### MINN. STAT. ANN. §§ 325D.49, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MINNESOTA)

245. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

246. In violation of Minn. Stat. Ann. § 325D.51, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

247. Defendants' violations of Minnesota law were flagrant and willful.

248. The Class has been injured in its business or property in Minnesota by Defendants' violations of Minn. Stat. Ann. § 325D.51.

## COUNT TWENTY-ONE

### VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE, MISS. CODE ANN. §§ 75-21-3, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MISSISSIPPI)

249. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

250. In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

251. Defendants' violations of Mississippi law were flagrant and willful.

252. The Class has been injured in its business or property in Mississippi by Defendants' violations of Miss. Code Ann. § 75-21-1, *et. seq.*

## COUNT TWENTY-TWO

### VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT, MONT. CODE ANN. §§ 30-14-101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MONTANA)

253. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

254. In violation of Mont. Code Ann. §§ 59-801 et seq., Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

255. Defendants' violations of Montana law were flagrant and willful.

256. The Class has been injured in its business or property in Montana by Defendants' violations of Mont. Code Ann. §§ 59-801 et seq.

## COUNT TWENTY-THREE

### VIOLATION OF THE NEBRASKA JUNKIN ACT,
### NEB. CODE ANN. §§ 59-801, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEBRASKA)

257.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

258.     In violation of Neb. Code Ann. § 59-801, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

259.     Defendants' violations of Nebraska law were flagrant and willful.

260.     The Class has been injured in its business or property in Nebraska by Defendants' violations of Neb. Code Ann. § 59-801.

## COUNT TWENTY-FOUR

### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT,
### NEV. REV. STAT. ANN. §§ 598A.010, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEVADA)

261.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262.     In violation of Nev. Rev. Stat. Ann. § 598A.060, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

263.     Defendants' violations of Nevada law were flagrant and willful.

264.     The Class has been injured in its business or property in Nevada by Defendants' violations of Nev. Rev. Stat. Ann. § 598A.060.

## COUNT TWENTY-FIVE

### VIOLATION OF THE NEW HAMPSHIRE ANTITRUST STATUTE, N.H. REV STAT. ANN. §§ 356.1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW HAMPSHIRE)

265. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266. In violation of N.H. Rev Stat. Ann. § 356.2, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

267. Defendants' violations of New Hampshire law were flagrant and willful.

268. The Class has been injured in its business or property in New Hampshire by Defendants' violations of N.H. Rev Stat. Ann. § 356.2.

## COUNT TWENTY-SIX

### VIOLATION OF THE NEW JERSEY ANTITRUST ACT, N.J. STAT. ANN. § 56:9-3, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW JERSEY)

269. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270. In violation of N.J. Stat. Ann. § 56:9-3, *et seq.*, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

271. Defendants' violations of New Jersey law were flagrant and willful.

272. The Class has been injured in its business or property in New Jersey by Defendants' violations of N.J. Stat. Ann. § 56:9-3, *et seq.*

## COUNT TWENTY-SEVEN

### VIOLATION OF THE NEW MEXICO ANTITRUST ACT,
### N.M. STAT. ANN. §§ 57-1-1, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW MEXICO)

273. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

274. In violation of N.M. Stat. Ann. § 57-1-1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

275. Defendants' violations of New Mexico law were flagrant and willful.

276. The Class has been injured in its business or property in New Mexico by Defendants' violations of N.M. Stat. Ann. § 57-1-1.

## COUNT TWENTY-EIGHT

### VIOLATION OF THE NEW YORK DONNELLY ACT,
### N.Y. GEN. BUS. LAW §§ 340, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW YORK)

277. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

278. In violation of N.Y. Gen. Bus. Law § 340, Defendants agreed not to compete. Defendants entered into contracts, agreements, arrangements, or combinations that have unreasonably restrained competition in New York. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products

279. Defendants' violations of New York law were flagrant and willful.

280. The Class has been injured in its business or property in New York by Defendants' violations of N.Y. Gen. Bus. Law § 340.

## COUNT TWENTY-NINE

### VIOLATION OF CHAPTER 75 OF NORTH CAROLINA'S GENERAL STATUTES, N.C. GEN. STAT. ANN. §§ 75-1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NORTH CAROLINA)

281. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

282. In violation of N.C. Gen. Stat. Ann. § 75-1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

283. Defendants' violations of North Carolina law were flagrant and willful.

284. The Class has been injured in its business or property in North Carolina by Defendants' violations of N.C. Gen. Stat. Ann. § 75-1.

## COUNT THIRTY

### VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE §§ 51-08.1-01, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NORTH DAKOTA)

285. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

286. In violation of N.D. Cent. Code § 51-08.1-02, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

287. Defendants' violations of North Dakota law were flagrant and willful.

288. The Class has been injured in its business or property in North Carolina by Defendants' violations of N.D. Cent. Code § 51-08.1-02.

**COUNT THIRTY-ONE**

**VIOLATION OF THE OREGON ANTITRUST ACT,
OR. REV. STAT. §§ 646.705, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN OREGON)**

289.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

290.    In violation of Or. Rev. Stat. § 646.725,  Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

291.    Defendants' violations of Oregon law were flagrant and willful.

292.    The Class has been injured in its business or property in Oregon by Defendants' violations of Or. Rev. Stat. § 646.725.

**COUNT THIRTY-TWO
VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,
R.I. GEN. LAWS §§ 6-36-1, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN RHODE ISLAND)**

293.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

294.    In violation of R.I. Gen. Laws § 6-36-4, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

295.    Defendants' violations of Rhode Island law were flagrant and willful.

296.    The Class has been injured in its business or property in Rhode Island by Defendants' violations of R.I. Gen. Laws § 6-36-4.

## COUNT THIRTY-THREE

### VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE,
### S.D. CODIFIED LAWS §§ 37-1-3.1, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN SOUTH DAKOTA)

297.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

298.    In violation of S.D. Codified Laws §§ 37-1-3.1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

299.    Defendants' violations of South Dakota law were flagrant and willful.

300.    The Class has been injured in its business or property in South Dakota by Defendants' violations of S.D. Codified Laws §§ 37-1-3.1.

## COUNT THIRTY-FOUR

### VIOLATION OF TENNESSEE'S TRADE PRACTICES ACT,
### TENN. CODE ANN. §§ 47-25-101, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN TENNESSEE)

301.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

302.    In violation of Tenn. Code Ann. § 47-25-101, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

303.    Defendants' violations of Tennessee law were flagrant and willful.

304.    The Class has been injured in its business or property in Tennessee by Defendants' violations of Tenn. Code Ann. § 47-25-101.

## COUNT THIRTY-FIVE

### VIOLATION OF THE UTAH ANTITRUST ACT,
### UTAH CODE ANN. §§ 76-10-3101, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN UTAH)

305.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

306.     In violation of Utah Code Ann. § 76-10-3104, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

307.     Defendants' violations of Utah law were flagrant and willful.

308.     The Class has been injured in its business or property in Utah by Defendants' violations of Utah Code Ann. § 76-10-3104.

## COUNT THIRTY-SIX

### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT,
### VT. STAT. ANN. TIT. 9, §§ 2451, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN VERMONT)

309.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

310.     In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

311.     Defendants' violations of Vermont law were flagrant and willful.

312.     The Class has been injured in its business or property in Vermont by Defendants' violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

## COUNT THIRTY-SEVEN

### VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,
### W.VA. CODE §§ 47-18-1, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN WEST VIRGINIA)

313.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

314.    In violation of W.Va. Code § 47-18-3, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

315.    Defendants' violations of West Virginia law were flagrant and willful.

316.    The Class has been injured in its business or property in Vermont by Defendants' violations of W.Va. Code § 47-18-3.

## COUNT THIRTY-EIGHT

### VIOLATION OF THE WISCONSIN ANTITRUST ACT,
### WIS. STAT. §§ 133.01, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN WISCONSIN)

317.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

318.    In violation of Wis. Stat. § 133.03, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

319.    Defendants' violations of Wisconsin law were flagrant and willful.

320.    The Class has been injured in its business or property in Vermont by Defendants' violations of Wis. Stat. § 133.03.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that the Court enter judgment on its behalf and on behalf of the Classes, by adjudging and decreeing as follows:

A.       Determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

B.       Appointing Plaintiffs as representatives of the Classes and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

C.       Adjudging and decreeing that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and a violation of each of the state laws alleged herein;

D.       Awarding compensatory damages for Defendants' violations under the state laws alleged herein, including multiple damages according to law against Defendants, jointly and severally, in an amount to be proven at trial;

E.       Awarding punitive, exemplary, statutory, and full consideration damages under the state laws alleged herein;

F.       Ordering the disgorgement of Defendants' profits that resulted from their wrongful and unlawful conduct, and ordering Defendants to pay restitution for the same;

G.       Entering judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Classes for treble the amount of damages sustained by Plaintiffs and the Classes as allowed by law, together with costs of the action, including reasonable attorneys'

fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

H.      Awarding pre- and post-judgment interest as provided by law;

I.      Awarding costs of suit, including reasonable attorneys' fees;

J.      Permanently enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

K.      Permanently enjoining each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, restraining them against, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

L.      Awarding Plaintiffs and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint that are so triable.

DATED: November 20, 2024

Respectfully submitted,

*/s/ Steve W. Berman*
STEVE W. BERMAN (ARDC 3126833)

Breanna Van Engelen (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

*/s/ Shana E. Scarlett*
SHANA E. SCARLETT (*pro hac vice forthcoming*)

Rio S. Pierce (*pro hac vice forthcoming*)
John M. Grant (*pro hac vice forthcoming*)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com
john.grant@hbsslaw.com

*/s/ Brent W. Johnson*
BRENT W. JOHNSON (*pro hac vice forthcoming*)

Alison Deich (*pro hac vice forthcoming*)
Zachary R. Glubiak (*pro hac vice forthcoming*)
Alex Bodaken (*pro hac vice forthcoming*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
bjohnson@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com
abodaken@cohenmilstein.com

*Counsel for Plaintiffs Rosemarie Muro, Teresa Contreras, Aaron Lancaster, and the Proposed Classes*